# No. _____

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

▶▶◀◀

GIUSEPPE PAMPENA, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED

*Plaintiff-Respondent,*

V.

ELON MUSK

*Defendant-Petitioner.*

_____

*Petition for Review of Order Granting Certification of Class
from the United States District Court for the Northern District of California
Honorable Charles R. Breyer
No. 3:22-CV-05937-CRB*

# DEFENDANT'S PETITION FOR PERMISSION TO APPEAL PURSUANT TO FED R. CIV. P. 23(f)

Michael Lifrak
Alex Bergjans
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Alex Spiro
David M. Cooper
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

October 11, 2024

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................. I

TABLE OF AUTHORITIES ...................................................................... II

PRELIMINARY STATEMENT ................................................................. 1

QUESTIONS PRESENTED ....................................................................... 3

STATEMENT OF FACTS .......................................................................... 5

    A.    Factual Background .................................................................. 5

    B.    Proceedings Below .................................................................. 8

STANDARD OF REVIEW .......................................................................... 9

ARGUMENT ............................................................................................. 10

I.    THE DISTRICT COURT MANIFESTLY ERRED AND
UNSETTLED THE LAW IN HOLDING THE *BASIC*
PRESUMPTION APPLIES TO A SUPPOSED
MISREPRESENTATION ABOUT A PUBLIC DOCUMENT .................. 10

    A.    Plaintiffs Failed To Prove An Efficient Market Because The
Premise Of Their Claim Is That The Market Did Not
Incorporate The Alleged Truth, Which Was Published During
The Class Period .................................................................... 11

    B.    Plaintiffs Failed To Prove They Sold The Stock Before The
Truth Was Revealed .............................................................. 16

    C.    Defendants Rebutted The *Basic* Presumption Because An
Alleged Falsity About A Public Document Did Not And Could
Not Impact The Stock Price ................................................... 18

II.    EVEN IF THE *BASIC* PRESUMPTION APPLIED, PLAINTIFFS
FAILED TO SHOW THE PREDOMINANCE OF COMMON
ISSUES ................................................................................................ 21

CONCLUSION AND RELIEF SOUGHT ............................................... 25

STATEMENT OF RELATED CASES ...................................................... 26

CERTIFICATE OF COMPLIANCE ......................................................... 27

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)................................................................10, 20

*In re Apache Corp. Sec. Litig.*,
  2024 WL 532315 (S.D. Tex. Feb. 9, 2024) .....................................20

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) .........................................................11

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp.*,
  879 F.3d 474 (2d Cir. 2018) ............................................................20

*Basic v. Levinson*,
  485 U.S. 224 (1988).....................................................................2, 10

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) .....................................................11, 14

*Bonanno v. Cellular Biomedicine Group*,
  2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) ..................................14

*Bricklayers & Trowel v. Credit Suisse*,
  853 F. Supp. 2d 181 (D. Mass. 2012)*, aff'd,* 752 F.3d 82 (1st Cir.
  2014) ................................................................................................18

*Brown v. Ambow Educ. Hldg.*,
  2014 WL 523166 (C.D. Cal. Feb. 6, 2014) .....................................14

*Butler v. Porsche Cars N. Am.*,
  2017 WL 1398316 (N.D. Cal. Apr. 19, 2017)..................................21

*Carpenters Pension Tr. Fund v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) .................................................16, 17

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) ...........................................................10

*In re Countrywide Fin. Corp. Sec. Litig.*,
  273 F.R.D. 586 (C.D. Cal. 2009)................................................11, 15

ii

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ...............................................................21

*Goldman Sachs Group v. Arkansas Teacher Retirement System*,
594 U.S. 113 (2021)...............................................................20, 21

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) .........................................................19

*Gurary v. Winehouse*,
190 F.3d 37 (2d Cir. 1999) .................................................................22

*Halliburton Co. v. Erica P. John Fund*,
573 U.S. 258 (2014)...............................................10, 11, 16, 18, 22

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)...................................13

*In re IPO Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006), *clarified*, 483 F.3d 70 (2d Cir. 2007)
.................................................................................12, 22, 23, 24

*In re Kosmos Energy*,
299 F.R.D. 133 (N.D. Tex. 2014) ...............................................22, 24

*N.J. Carpenters Health Fund v. Res. Cap.*,
272 F.R.D. 160 (S.D.N.Y. 2011), *aff'd*, 477 F App'x 809 (2d Cir.
2012) ...................................................................................................23

*Pampena v. Musk*,
705 F. Supp. 3d 1018 (N.D. Cal. 2023).....................................6, 8, 12

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084 (S.D.N.Y. July 10, 2019)....................................16

*Teamsters Local 445 v. Bombardier, Inc.*,
2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), *aff'd* 546 F.3d 196
(2d Cir. 2008)......................................................................................11

*In re Tesla, Inc. Sec. Litig.*,
2022 WL 1497559 (N.D. Cal. Apr. 1, 2022)......................................19

iii

*Vignola v. Fat Brands*,
   2020 WL 1934976 (C.D. Cal. Mar. 13, 2020).............................................22, 23

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)........................................................................................11

*Zimmerman v. Bell*,
   800 F.2d 386 (4th Cir. 1986)..........................................................................22

## PRELIMINARY STATEMENT

In this case, the district court became seemingly the first in U.S. history to certify a securities class action based on an alleged misrepresentation about whether particular terms were or were not contained within a publicly-disclosed document. The district court's incorrect and unprecedented decision warrants this Court's immediate review and reversal.

Plaintiffs allege that a tweet from Elon Musk, concerning Musk's alleged rights and obligations under a public merger agreement (the "Merger Agreement"), misled a proposed class of all investors that sold Twitter stock any time in a four-plus month period after Musk's purported misstatement. The problem for Plaintiffs is that not only was the Merger Agreement public, but Bloomberg, among others, published papers immediately after the tweet that revealed exactly what Plaintiffs here allege to be the truth about the Merger Agreement. Indeed, Plaintiffs' own lawyers filed a securities fraud suit only 12 days after the tweet, stating the supposed truth and why the tweet was supposedly false.

Plaintiffs therefore were left with the theory that the market price of Twitter stock did *not* incorporate the widely publicized truth, and instead remained deflated by the allegedly false tweet for months. The district court accepted this theory, which presumes a wildly inefficient market. Nonetheless, the district court certified the class on the assumption of an efficient market, which is a precondition for

1

Plaintiffs to invoke a presumption of reliance under *Basic v. Levinson*, 485 U.S. 224 (1988). The district court failed to address, let alone resolve, this stark inconsistency, where the market is efficient for purposes of *Basic* but ignored for months the purported truth that was publicly known and knowable to well-informed investors— the antithesis of an efficient market. Instead, the court invented a novel and troubling rule that publications like Bloomberg are not "information" for purposes of understanding the knowledge of the market.

The district court also erred in ignoring that another *Basic* prerequisite is unsatisfied, as at least thousands of class members (and all Lead Plaintiffs) did not sell the stock before the truth was revealed shortly after (if not simultaneously with) the alleged misstatement. The undisputed evidence demonstrates that prominent market participants read the Merger Agreement and discovered the alleged falsity well before the end of Plaintiffs' proposed class period. If the market were efficient, then the revelation of the truth would be fully incorporated into the stock price even if only sophisticated investors knew the truth.

In addition, the district court erred in refusing to consider evidence of price impact, which rebuts the *Basic* presumption. According to the district court, the fact that the market knew the truth may be considered only at the merits stage. However, the Supreme Court has held that *all* evidence of price impact should be considered

on class certification, and the Second Circuit has recognized that this includes evidence that the market knew the truth.

Finally, the district court further erred in treating the *Basic* presumption as a *per se* bar on consideration of whether common issues predominate. While in most cases the *Basic* presumption will suffice for predominance, it does not absolve the court from examining whether there may be individualized issues that defeat predominance. Here, there would be innumerable individualized inquiries regarding whether each class member knew the truth regarding the Merger Agreement because he or she read that agreement or publications about it.

Accordingly, Rule 23(f) review is warranted to correct the district court's manifest errors and to avoid years of litigation by a non-cognizable class followed by a trial where individual issues will predominate over common ones.

## QUESTIONS PRESENTED

1. Whether the district court erred in holding the *Basic* presumption applied where (a) Plaintiffs' claim is based on the idea that the market did not incorporate well-publicized information of what Plaintiffs allege to be the truth; (b) even if there were an efficient market, the supposed truth was revealed immediately after the alleged misrepresentation; and (c) there could be no price impact from the alleged misrepresentation given the market's knowledge of the supposed truth.

2.     Whether the district court erred in holding that the *Basic* presumption absolves Plaintiffs from the requirement to prove the predominance of common issues.

## STATEMENT OF FACTS

### A.    Factual Background

On April 25, 2022, Musk and Twitter entered into a public Merger Agreement. Closing was to occur within six months, provided certain enumerated "CONDITIONS TO THE MERGER" were satisfied.[1]

On May 13, 2022, Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculations that spam/fake accounts do indeed represent less than 5% of users."  Dkt. 31 (First Am. Compl. ("FAC")) ¶ 111.



Following this tweet, the Merger was delayed, including by litigation about whether spam/fake accounts were less than 5% of Twitter users.  *Id.* ¶¶ 112-151.

---

[1]
https://www.sec.gov/Archives/edgar/data/1418091/000119312522120474/d310843
ddefa14a.htm.

Plaintiffs allege the tweet was false, not because the deal was not in fact "temporarily on hold" but rather because it purportedly falsely implied Twitter was obligated to provide bot data as a condition to closing under the Merger Agreement. *See Pampena v. Musk*, 705 F. Supp. 3d 1018, 1041-42 (N.D. Cal. 2023). Plaintiffs further allege that "truth" was first revealed months later, on October 4, 2022, when Musk agreed to resolve litigation by proceeding to closing under the Merger Agreement. *Id.* at 1051-53. That period of May 13 to October 4, 2022 is Plaintiffs' putative class period. Dkt. 31 (FAC) ¶¶ 1, 176.

A few hours after Musk's tweet, on May 13, 2022, a Bloomberg column ran, responding to Musk's tweet: "None of this! Come on. … Elon Musk has signed a binding contract requiring him to buy Twitter. … That contract does not allow Musk to walk away if it turns out that 'spam/fake accounts' represent more than 5% of Twitter users. … It is easy for me, sitting here and looking at the contract, to say that Twitter would win that lawsuit and a court would order Musk to pay the money and close the deal." Dkt. 59-1 (Decl. for Def.'s 12(c) Mot.) at 291-94. The Bloomberg column also stated: "Lots of people reading the contract this morning." *Id.* at 294. And it included a link to that very contract. *Id.* at 292.

On May 25, 2022, William Heresniak filed a securities class action, covered by national media publications, alleging that Musk's May 13 tweet "was misleading because it stated or implied that Musk's obligation to consummate the Buyout was

conditioned on his satisfaction with due diligence to determine whether 'spam/fake accounts do indeed represent less than 5% of users.' ... Musk has no right to cancel the Buyout based on any results from due diligence concerning the number of fake accounts at Twitter." *Id.* at 386-87.

And on July 18, 2022, Wells Fargo published a research report summarizing the opinions of a law professor and rejecting the idea that Musk could terminate the deal based on spam/fake accounts. *Id.* at 312. In particular, the Wells Fargo analyst report explained that, under the Merger Agreement, information rights were limited "to information requests relevant only to deal consummation" and that Musk, therefore, "appears unlikely to prevail in his argument that TWTR [Twitter] has breached the information covenant, per Prof. Miller." *Id.*

Plaintiffs also allege misstatements on May 16 and 17, 2022 related to Musk's right and access to bot data. Dkt. 31 (FAC) ¶¶ 120-27. But those statements had no statistically significant impact on Twitter's stock price. Dkt. 99-6 (Saha Report) ¶¶ 36, 37 (May 16); *id.* ¶ 33, Exhibit 1, ¶ 34, Dkt. 99-7 (Tabak Tr.) 90:23-25). Accordingly, the district court relied on the May 13 tweet for supposed impact on the stock price. Dkt. 106 ("Order") at 7-8. Because the other alleged misstatements did not impact the stock price, the district court did not and could not suggest that these alleged misstatements (standing alone) could support class certification. *Id.*

### B.    Proceedings Below

On December 11, 2023, the district court denied in part Defendant's motion to dismiss.  *See Pampena*, 705 F. Supp. 3d at 1029.  Regarding the May 13 tweet, it concluded that "a reasonable investor could have plausibly understood that Twitter was obligated to provide [Musk] with the requested information for the deal to close."  *Id.* at 1041.  The court held that "[Musk's] representation that Twitter <u>did</u> have this obligation in order for the deal to close was false" because the purported truth was that "Twitter <u>did not</u> have an obligation to provide this data to [Musk] under the terms of the Merger Agreement."  *Id.* at 1042.  Thus, according to the court, Plaintiffs pled scienter because Musk was "at least deliberately reckless to not investigate that obligation with respect to the merger agreement before making his statements."  *Id.* at 1049.

On August 5, 2024, the district court relied on the law of the case doctrine to deny Musk's motion for judgment on the pleadings.  Dkt. 89 (Order Denying 12(c) Mot.) at 5.  That motion sought dismissal because, among other things, the Merger Agreement disclosed the conditions to closing, which were also disclosed and discussed in a Bloomberg article, a securities class action, and a Wells Fargo research report.  Dkt. 59 (Def.'s 12(c) Mot.) at 7-11.  However, the court applied "law of the case" because, in previously ruling on the motion to dismiss, "the Court

was fully aware of the provisions of the Merger Agreement that Musk now points to." Dkt. 89 (Order Denying 12(c) Mot.) at 5.

On September 27, 2024, the district court granted Plaintiffs' motion for class certification. The court rejected Musk's arguments that Plaintiffs failed to satisfy their burden of proving *Basic*'s applicability. Order at 4-8. Musk argued that Plaintiffs' theory of liability was incompatible with an efficient market, and if there were an efficient market, there could be no price impact because the alleged misrepresentations concerned the terms of a publicly-disclosed Merger Agreement. *Id.* at 6-8.

With respect to the Bloomberg article and Wells Fargo report, the court concluded that these were not "information" that would be considered by the market. *Id.* at 6. As to the *Heresniak* complaint, the court "reject[ed]" the evidence so as not to "penalize" filing of securities class actions. *Id.* at 7 n.2. It further held that once *Basic* is satisfied, there need be no further inquiry into whether common issues predominate. *Id.* at 8.

## STANDARD OF REVIEW

Review of class certification decisions is appropriate when: "(1) there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable; (2) the certification decision presents an unsettled

and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or (3) the district court's class certification decision is manifestly erroneous." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005). Here, as discussed below, the district court's decision was manifestly erroneous and unsettled the law by creating a new kind of securities law class action for alleged misrepresentations about the terms of a publicly-filed document.

## **ARGUMENT**

**I.   THE DISTRICT COURT MANIFESTLY ERRED AND UNSETTLED THE LAW IN HOLDING THE *BASIC* PRESUMPTION APPLIES TO A SUPPOSED MISREPRESENTATION ABOUT A PUBLIC DOCUMENT**

To prove class-wide reliance, Plaintiffs rested on the "presumption of reliance" under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Without that presumption, Plaintiffs would be unable to establish a certifiable class "because individual reliance issues would overwhelm questions common to the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462-63 (2013); Order at 5 ("Plaintiffs do not intend to prove individual reliance."). To invoke the *Basic* presumption of reliance, Plaintiffs needed to "prove that," among other things, "(3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 277-78 (2014).

### A. Plaintiffs Failed To Prove An Efficient Market Because The Premise Of Their Claim Is That The Market Did Not Incorporate The Alleged Truth, Which Was Published During The Class Period

Plaintiffs failed to meet their burden to prove an efficient market. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 n.6 (2011) ("[P]laintiffs seeking 23(b)(3) certification must prove that their shares were traded on an efficient market."). By definition, an "efficient market reflects all public, material information." *Halliburton*, 573 U.S. at 263; *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) ("[I]n an efficient market … all publicly available information … is quickly incorporated into the stock price."). The reason is simple: "so as to eliminate arbitrage opportunities." *Teamsters Local 445 v. Bombardier, Inc.*, 2006 WL 2161887, at *7 (S.D.N.Y. Aug. 1, 2006), *aff'd* 546 F.3d 196 (2d Cir. 2008). It thus does not matter whether all investors are well informed because "the opinions of 'noise traders'—the relatively uninformed—cancel each other out or are overpowered by the better informed." *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 611 (C.D. Cal. 2009); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) ("[I]t is a basic assumption of the securities laws that the partially-informed investors will cancel each other out, and that Apple's stock price will accurately reflect all relevant information.").

Though the premise of Plaintiffs' claim is that publicly available information here—the conditions to closing in a merger agreement—was *not* reflected in the

market price for Twitter stock, the district court nevertheless found that Plaintiffs established an efficient market.  This was manifest error.

When Plaintiffs' own theory is inconsistent with an efficient market, the *Basic* presumption does not apply.  *See In re IPO Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006) ("[T]he Plaintiffs' own allegations as to how slow the market was to correct the alleged price inflation … indicate the very antithesis of an efficient market."), *clarified*, 483 F.3d 70 (2d Cir. 2007).  Here, Plaintiffs' allegations are unequivocal that the supposed "truth" is that the Merger Agreement did not entitle Musk to condition closing on receipt of bot data.  *See* Dkt. 31 (Am. Compl.) ¶ 4 ("[N]othing **in the merger agreement** allowed Musk to put the Buyout on hold" (emphasis added)); *Pampena*, 705 F. Supp. 3d at 1042 ("Because Twitter <u>did not</u> have an obligation to provide this data to Defendant **under the terms of the Merger Agreement**, Defendant's representation that Twitter <u>did</u> have this obligation in order for the deal to close was false." (bold emphasis added)).  It is equally unequivocal that the truth concerning Musk's rights under the Merger Agreement was contained within the four corners of the Merger Agreement itself—and the alleged falsity of Musk's tweet was published in articles and a lawsuit published shortly after the tweet. *See supra* at 6-7.  Thus, Plaintiffs' theory is based entirely on the idea that the market did not reflect this public information, which could only occur if the market was not efficient.

The district court's holding to the contrary was based on a novel and manifestly erroneous approach to securities law.

*First*, the court held that "the Merger Agreement[] does not clearly showcase the falsity of Musk's statements." Order at 6. In so holding, the court became seemingly the first to conclude that a misstatement about whether particular terms were or were not contained within a publicly-disclosed document can be considered securities fraud. And it also misses the point for purposes of determining whether there is an efficient market. The question is not whether the Merger Agreement clearly showcased that Musk's tweet was false, but whether there was publicly available information about the *truth*—however Plaintiffs want to define the truth—of what the Merger Agreement allowed or did not allow. That information was public because the Merger Agreement was public.

*Second*, the court held (*sua sponte*) that the Bloomberg article and Wells Fargo report did not constitute publicly available information. Order at 6 ("An efficient market presumes that all publicly available <u>information</u>—not investors' 'comments' on, or their 'aggregation' or 'summary' of, that information—is reflected in the stock price."). This holding is likewise novel and manifestly erroneous. Courts routinely consider articles and reports in determining what the market knew and when. *See, e.g.*, *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14 (N.D. Cal. Dec. 22, 2016) ("[T]he market would have [] quickly incorporated the information

13

contained in the Bloomberg article into Inuitive's stock price."); *Brown v. Ambow Educ. Hldg.*, 2014 WL 523166, at *11 (C.D. Cal. Feb. 6, 2014) ("[T]he Bloomberg article could potentially serve as an additional corrective disclosure."). The lone case the court cited (Order at 6), *Bonanno v. Cellular Biomedicine Group*, 2016 WL 4585753 (N.D. Cal. Sept. 2, 2016), does not support the court's approach, as it held only that the market incorporated "publicly available facts" *before* they were compiled into an analyst report. 2016 WL 4585753, at *4-5. It was *only* for that reason—*i.e.*, that the information was *already* publicly available—that the analyst report was not considered a corrective disclosure there. *Id.*; *see also In re Bofl Holding*, 977 F.3d at 794 (holding that the subject "stock price should already reflect whatever public information a blog post might be based upon.").

The undisputed facts further belie the court's approach. Plaintiffs never argued that the Bloomberg article should not be considered because it was not "information" available to an efficient market. That is because Plaintiffs' expert conceded that the Bloomberg article would have been reviewed by market participants and, to the extent correct, any analysis in it would be incorporated into the market price. Dkt. 99-7 (Tabak Tr.) at 111:22-120:3 (agreeing that "the market could evaluate [the Bloomberg] opinion and integrate that evaluation into the stock price"). This would include "all the links [and] facts underlying it [that] were public." *Id.* at 120:1-3. The Bloomberg article and Wells Fargo report are, at a

minimum, evidence that "better-informed" investors were capable of determining the conditions to closing under the Merger Agreement. In an efficient market, this would "overpower" any reactionary trading around Musk's tweet to the extent it falsely portrayed the true terms of the Merger Agreement. *See Countrywide*, 273 F.R.D. at 611. Accordingly, Plaintiffs did not contest that the market could have discovered the truth, it only contended that the market *did not* actually reflect the truth, Dkt. 102 (Pls. Reply) at 7-8—meaning, that the market did not behave efficiently.

*Third*, the court held it did not matter that a lawsuit filed shortly after the tweet showed that at least one investor—and anyone else who read the complaint—knew the supposed truth. Once again, the court disregarded this point on grounds that are unprecedented and manifestly erroneous. The lawsuit plainly revealed what Plaintiffs allege to be the truth here, *i.e.*, that the May 13 tweet was "misleading" because "Musk has no right to cancel the Buyout based on any results from due diligence concerning the number of fake accounts at Twitter." Dkt. 59-1 (*Heresniak* Compl.) at 386-87. The district court "reject[ed]" this evidence to avoid a "perverse effect of penalizing plaintiffs and their lawyers for enforcing the securities laws." Order at 7 n.2. The court provided no citation for that rule. Regardless, the issue is not whether anyone should be penalized, but whether the court should pretend that no one knew the alleged falsity when the lawsuit proves beyond doubt that some did.

Nor can the court ignore the consequence of this fact, which is that if (as Plaintiffs contend) the market did not incorporate the truth, despite sophisticated investors' knowledge of it, then the market cannot be deemed efficient and *Basic* does not apply.

In sum, this Court's review is warranted given the unprecedented and troubling nature of the district court decision, whereby a court can treat a market as efficient without regard to whether it incorporated publicly available information. If uncorrected, this ruling would unsettle the law regarding securities class actions and could evade end-of-case review, given the rarity of a securities fraud case proceeding through trial.

## B. Plaintiffs Failed To Prove They Sold The Stock Before The Truth Was Revealed

Plaintiffs also failed to prove the fourth *Basic* requirement, *i.e.*, that they "traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton*, 573 U.S. at 277-78. For at least those class members who sold after publication of the Bloomberg article on May 13, 2022— mid-way through the first day of the 144-day class period—they fail to meet this requirement. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *19 (S.D.N.Y. July 10, 2019) ("Plaintiff cannot avail itself of the *Basic* presumption of reliance if, by its own admission, the truth was fully revealed prior to the end of the class period." (citing fourth *Basic* requirement)); *Carpenters Pension Tr. Fund v.*

16

*Barclays PLC*, 310 F.R.D. 69, 97 (S.D.N.Y. 2015) ("Courts are required to cut off the class period on the date … when the truth has been disseminated to the market." (cleaned up)). As discussed above, the Bloomberg article linked to the Merger Agreement and published the purported falsity of Musk's tweet to the market along with the source for the truth, sufficient for any investor to ascertain for themselves what the true conditions to closing were in the Merger Agreement. At least some did so, including Heresniak, who filed suit on May 25, 2022 alleging that bot data was not a condition to closing. Plaintiffs' purported class, stretching out to October 4, 2022, thus includes many who sold after publication and dissemination of the truth. These class members fail the fourth *Basic* factor.

The district court treated as law of the case its ruling on the motion to dismiss that there was no corrective disclosure prior to the end of the class period because some investors might have remained confused about the truth. Order at 6 ("[A]s the Court has already held, the publicly available information in this case (namely, the Merger Agreement) does not clearly showcase the falsity of Musk's statements."). However, if there is an efficient market, then the question is not whether most or even many investors would have understood the truth. The question is only whether sophisticated investors could do so because, in an efficient market, they would ensure that the stock price incorporated all public information. *See supra* § I.A. And there is no dispute that at least sophisticated investors could and did know exactly

what the Merger Agreement allowed and did not allow by reading that very Merger Agreement.[2] Simply put, Plaintiffs and the court cannot have it both ways, treating the market as efficient for purposes of the market supposedly incorporating the tweet but inefficient for purposes of the market supposedly not incorporating the truth revealed in the Merger Agreement and subsequent published documents. *Cf. Bricklayers & Trowel v. Credit Suisse*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) ("Plaintiffs may not at the same time presume an efficient market to prove reliance and an inefficient market to prove loss causation. They may not have their cake and eat it too."), *aff'd*, 752 F.3d 82 (1st Cir. 2014). Either way, the requirements for the *Basic* presumption are not satisfied here.

## C. Defendants Rebutted The *Basic* Presumption Because An Alleged Falsity About A Public Document Did Not And Could Not Impact The Stock Price

Even assuming the *Basic* presumption applies here, Defendants rebutted that presumption here by demonstrating a lack of price impact. A defendant can rebut the *Basic* presumption and defeat class certification based on "evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Halliburton*, 573 U.S. at 268. "While *Basic* allows plaintiffs to establish [reliance] indirectly, it does not require courts to ignore a defendant's

---

[2] While the district court suggests that Plaintiffs did not concede this point, the court does not find (nor could it) that sophisticated investors were unaware of what Plaintiffs allege to be the truth. *See* Order at 6.

direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply." *Id.* at 282.

The alleged misrepresentation did not affect the stock price here for the simple reason that the market already knew and could easily verify exactly what the Merger Agreement did or did not allow. The district court held that the stock price moved after the tweet and then moved again at the end of the class period, and this was enough to show price impact. Order at 7-8. But the court again applied the wrong test as a matter of law. Even if the tweet moved the stock price, the question is whether the alleged *falsity* moved it. *See, e.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (dismissing claims where a "stock price drop" was not caused by "anything materially misleading about these statements"); *In re Tesla, Inc. Sec. Litig.*, 2022 WL 1497559, at *21 (N.D. Cal. Apr. 1, 2022) (denying summary judgment where price drop could have been caused by non-false aspect of statements). That is a critical distinction here because the tweet's statement that the deal was "on hold" is undisputedly true and undisputedly would affect the stock price. As to whether the alleged falsity in the tweet—that the deal could be cancelled based on spam/fake accounts—*also* impacted the stock price, the district court engaged in no analysis at all.

The court's failure to engage in any analysis as to whether the alleged falsity impacted the price is manifest error. The court justified its decision on the ground that a "'truth-on-the-market' defense like Musk's 'is a matter for trial,' not for class certification." Order at 7 (quoting *Amgen*, 568 U.S. at 481-82). However, "[t]he 'truth on the market' defense attacks the timing of the plaintiffs' purchase of shares, not price impact." *Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp.*, 879 F.3d 474, 486 (2d Cir. 2018). There is no bar on considering—and a court is required to consider where there is evidence on the issue—whether an alleged misstatement impacted the price, even if one reason it did not was because the market knew the truth. *See id.* ("If a defendant shows that an alleged misrepresentation did not, for whatever reason, actually affect the market price … the fraud-on-the-market theory underlying the presumption would completely collapse." (cleaned up)); *see also, e.g.*, *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *13 (S.D. Tex. Feb. 9, 2024) ("Defendants must be afforded an opportunity before class certification to defeat the presumption through evidence." (cleaned up)).

If there were any doubt on this issue, the Supreme Court resolved it in *Goldman Sachs Group v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021), which held: "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense. That is so regardless whether the evidence is also

relevant to a merits question like materiality." *Id.* at 122 (cleaned up). The district court's refusal to consider "*all* probative evidence" because it concerned the market's knowledge of the truth conflicts directly with *Goldman*.

Finally, the district court's legal error was dispositive here because there is no evidence that the alleged falsity itself moved the stock price, and overwhelming evidence it did not, given that the market already knew the terms of the Merger Agreement. Indeed, that is why seemingly no court ever has held (until now) that a supposed falsity about whether particular terms were or were not contained within a publicly-disclosed document can give rise to a securities class action.

## II. EVEN IF THE *BASIC* PRESUMPTION APPLIED, PLAINTIFFS FAILED TO SHOW THE PREDOMINANCE OF COMMON ISSUES

Plaintiffs did not meet their "burden to show that common questions predominate over individual questions." *Butler v. Porsche Cars N. Am.*, 2017 WL 1398316, at *4 (N.D. Cal. Apr. 19, 2017) ; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011) ("Parties seeking class certification bear the burden of demonstrating that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)."). Here, regardless of the *Basic* presumption, knowledge is an individualized issue that defeats predominance.

A plaintiff alleging securities fraud must always "prove[] that the claimant traded 'in ignorance of the fact that the price was affected by the alleged

manipulation.'" *IPO,* 471 F.3d at 43; *see also Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) ("[I]ndividual class members must demonstrate that the omitted information was not otherwise available to them."); *Vignola v. Fat Brands*, 2020 WL 1934976, at *4-5 (C.D. Cal. Mar. 13, 2020) ("[I]ndividualized issues regarding knowledge can be sufficient to defeat class certification."). There is no dispute that a Section 10(b) claimant "must allege and prove" that the claimant traded "in ignorance of the fact that the price was affected by the alleged manipulation." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999). And the *Basic* presumption does not satisfy this inquiry. *IPO,* 471 F.3d at 43. Thus, regardless of whether a plaintiff invokes the *Basic* presumption, that does not free the plaintiff from proving "ignorance of the fact that the price was affected by the alleged manipulation." *Id.* Indeed, a plaintiff who "would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud," is not entitled to the benefits of *Basic* at all and, thus, creates predominance issues. *Halliburton*, 573 U.S. at 269.

That lack of knowledge is an independent hurdle to class certification is abundantly clear from the fact that even in "Section 11 claims," where *reliance is not an element, IPO*, 483 F.3d at 73 n.1, courts have denied class certification where individual questions regarding plaintiffs' actual knowledge will predominate. *See, e.g.*, *IPO*, 471 F.3d at 43; *In re Kosmos Energy*, 299 F.R.D. 133, 152-54 (N.D. Tex. 2014). Thus, regardless of the reliance element, where a proposed class "include[s]

22

investors with different levels of knowledge," class certification is precluded because "those issues predominate over the common issues identified by the Plaintiffs." *N.J. Carpenters Health Fund v. Res. Cap.*, 272 F.R.D. 160, 170 (S.D.N.Y. 2011), *aff'd*, 477 F App'x 809 (2d Cir. 2012).

The district court held nonetheless that because "the *Basic* presumption applies, the predominance requirement of Rule 23(b)(3) is met." Order at 8. *Basic* is not so absolute. Though *Basic* resolves the need for inquiries whether individual investors actually read or were aware of the alleged misrepresentation, it does not absolve Plaintiffs of proving that individual investors were not already aware of the alleged falsity. Thus, just as class certification cannot be granted in Section 11 cases where individual issues of actual knowledge predominate, so too class certification cannot be granted in a Section 10(b) case with individual issues of actual knowledge.

Although the knowledge of individual investors is not ordinarily "a major hurdle to certification because the information allegedly misstated or omitted concerns . . . internal non-public information that would suggest general lack of knowledge," here, "the allegedly omitted information that rendered" Musk's statements "allegedly misleading was public information." *Vignola*, 2020 WL 1934976, at *4-5. Because at least anyone capable of "deciphering" the Merger Agreement in the manner Plaintiffs' counsel did in May 2022 (and the District Court did at the motion to dismiss stage), as well as Bloomberg readers and Wells Fargo

23

subscribers, could have been exposed to the alleged truth, the class definition here necessarily "precipitate[s] individual inquiries as to the knowledge [or lack thereof] of each member of the class" and precludes Plaintiffs from satisfying Rule 23(b)(3)'s predominance requirement. *IPO*, 471 F.3d at 44. Class certification should be denied where, as here, there are "thousands[] of potential investors" that may have had the "ability to glean" the true conditions to closing. *Kosmos*, 299 F.R.D. at 151.

In fact, for one of the lead plaintiffs, the court held that his "specific identification of something other than the integrity of the market (and, of course, other than Musk's allegedly misleading statements) that caused him to sell Twitter stock 'severs' any causal chain linking his decision to Musk's statements and rebuts the presumption that he relied on Musk's statements." Order at 9-10. But the court failed to recognize that this same analysis would be required for "thousands[] of potential investors." *Kosmos*, 299 F.R.D. at 151.

The district court's wholesale rejection of the evidence that market participants would have discovered the purported falsity during the class period resulted in certification of a class that includes many individual investors without viable claims. Moving forward, the question of which investors have claims and which do not—*i.e.*, the highly individualized analysis the court performed for the named plaintiffs, Order at 9-11, and would have to be performed for each and every class member—will predominate over questions common to *all* class members.

## <u>CONCLUSION AND RELIEF SOUGHT</u>

This Court should grant the petition for permission to appeal.


Dated:  October 11, 2024               Respectfully submitted,

_/s/  David M. Cooper_

Alex Spiro
David M. Cooper
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Michael Lifrak
Alex Bergjans
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

*Counsel for Defendant-Petitioner*

## **STATEMENT OF RELATED CASES**

Defendant-Petitioner is not aware of any related cases pending in this Court.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 5 and 32 and Ninth Circuit Rules 5-2 and 32-3, the foregoing petition is in 14-point, proportionally spaced Times New Roman type and contains 5,531 words.

Dated:  October 11, 2024          _/s/_ David M. Cooper _____

# ORDER

1

2

3

4

5            IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    GIUSEPPE PAMPENA, et al.,              Case No.  22-cv-05937-CRB

9              Plaintiffs,

10         v.                               **ORDER GRANTING CLASS
                                            CERTIFICATION**
11   ELON MUSK,

12              Defendant.

13          Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave bring

14   this securities class action against Defendant Elon Musk, alleging that Musk violated

15   Section 10(b) of the Securities Exchange Act of 1934, as well as Rule 10b-5, by making

16   multiple misstatements to artificially depress the price of Twitter stock.  Lead Plaintiffs

17   now move for certification of a class defined as follows:

18              All persons and entities who sold the publicly traded stock or
                call options, or purchased the put options, of Twitter, Inc.
19              during the period from May 13, 2022 through October 4, 2022,
                both dates inclusive (the "Class Period"), and who suffered
20              damages by Defendant's alleged violations of § 10(b) and of
                the Exchange Act.
21

22   Lead Plaintiffs move to appoint themselves as class representatives and to appoint Cotchett

23   Pitre & McCarthy LLP and Bottini & Bottini, Inc. as class counsel.  The Court **GRANTS**

24   Plaintiffs' motion **EXCEPT** as to the appointment of Steve Garrett as class representative.

25   **I.    BACKGROUND**

26      **A.    Factual History**

27          The Court has already described the facts giving rise to this lawsuit on multiple

28   occasions.  See Order Granting in Part & Denying in Part Mot. to Dismiss (dkt. 48), 705 F.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Supp. 3d 1018 (N.D. Cal. 2023); Order Denying J. on the Pleadings (dkt. 89), 2024 WL

2  3678002 (N.D. Cal. Aug. 5, 2024).  In this order, the Court repeats only those facts

3  necessary to resolve the motion at hand.

4        In April 2022, Twitter entered an agreement (the "Merger Agreement") to be

5  acquired by an entity wholly owned by Musk for $54.20 per share.  First Am. Compl.

6  (dkt. 31) ¶ 85.  In the following weeks, Musk made several tweets and public comments

7  about the agreement.  Plaintiffs allege that the following were misstatements:

8        • Musk tweeted on May 13, 2022: "Twitter deal temporarily on hold pending

9            details supporting calculation that spam/fake accounts do indeed represent less

10           than 5% of users."  Id. ¶ 111.

11       • Musk said at a tech conference on May 16, 2022 that fake and spam accounts

12           make up at least 20% of Twitter's users.  Id. ¶ 120.

13       • Musk tweeted on May 17, 2022: "20% fake/spam accounts, while 4 times what

14           Twitter claims, could be *much* higher.  My offer was based on Twitter's SEC

15           filings being accurate.  Yesterday, Twitter's CEO publicly refused to show proof

16           of <5%.  This deal cannot move forward until he does."  Id. ¶ 125.

17  After these statements, Twitter's stock declined from $45.08 per share (its value on May

18  12, 2022) to $35.76 per share (its value on May 24).  Id. ¶¶ 113, 131.

19       On October 4, 2022, Musk publicly announced that he had informed Twitter that he

20  intended to go through with the Merger Agreement at the initial offer price.  Id. ¶ 41.  By

21  the close of the next day, Twitter's stock had risen to $51.30 per share.  Id.

22       **B.    Lead Plaintiffs**

23       The Court appointed Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave

24  as Lead Plaintiffs under the Private Securities Litigation Reform Act of 1995.  See Order

25  Denying/Granting Mot. to Appoint Lead Pl. & Lead Counsel (dkt. 30), 2023 WL 3082341

26  (Apr. 24, 2023).  Lead Plaintiffs are individual investors who collectively sold 28,389

27  shares of Twitter common stock during the Class Period (May 13 to October 4, 2022) and

28  allegedly suffered financial losses of over $500,000.  See Summary Loss Chart (dkt. 8-4).

2

1    **Brian Belgrave** is a business owner with a bachelor's degree in accounting from

2   the University of Oregon and with "decades" of experience investing in the stock market.

3   Joint Decl. (dkt. 8-5) at 1.  Belgrave bought Twitter stock in the immediate aftermath of

4   Musk's statements in May 2022 because he still "thought" and "hoped" that Musk's

5   purchase of Twitter would close.  Belgrave Dep. Tr. (dkt. 99-4) at 82:2–16, 181:2–7.

6   Belgrave did not, however, believe that Musk's statements in May 2022 were false.  Id. at

7   178:25–179:1.  And as the value of Twitter's stock continued to drop, Belgrave became

8   worried that the deal would not go through and sold his shares.  Id. at 119:24–120:1,

9   151:1–8.

10    **Steve Garrett** is a commercial pilot with over 35 years of experience investing in

11   the stock market.  Joint Decl. at 1.  Much like Belgrave, Steve bought Twitter stock in

12   mid-May because he "believed" that the deal would close.  S. Garrett Dep. Tr. (dkt. 99-5)

13   at 61:15–18.  He then sold his shares in July after Musk stated that he was "terminating"

14   the deal.  Id. at 31:3–6.  In his deposition, Steve did not indicate familiarity with Musk's

15   statements from May 2022, and he did not state that he relied on those statements when he

16   sold his shares.  See id. at 30:25–31:16.

17    **John Garrett** has over 50 years of experience investing in the stock market.  Joint

18   Decl. at 1.  He "traded on the information that … [Musk] was going to buy the shares [in

19   Twitter] for $54.20."  J. Garrett Dep. Tr. (dkt. 102-5) at 102:8–10.  And when "it turned

20   out … that [Musk] wasn't going to buy the company," John sold his shares in Twitter.  Id.

21   at 103:7–10.

22    **Nancy Price**, John Garrett's domestic partner of over 30 years, "also has years of

23   experience investing with [John] Garrett in the stock market."  Joint Decl. at 1.  At her

24   deposition, Price testified that her awareness of Musk's statements largely comes from

25   conversations she had with John Garrett.  See Price Dep. Tr. (dkt. 99-3) at 67:7–14, 68:13–

26   69:17, 74:18–23.  She repeatedly expressed uncertainty as to what John told her about

27   Musk's statements, id. at 67:18 (Musk's statements were "probably from television");

28   when he told her Musk had lied, id. at 69:15–16 ("I would imagine it was perhaps May of

3

'22"); and what he did after finding out that Musk had lied, id. at 72:16–17 ("I think he probably sold Twitter stock").

## II.   LEGAL STANDARD

Rule 23 of the Federal Rules of Civil Procedure, which governs class actions, requires that the Court find by a preponderance of the evidence that the requirements of Rule 23(a), as well as one of three possible requirements under Rule 23(b), are met.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997).  The Rule 23(a) requirements are that (1) "the class is so numerous that joinder of all members is impracticable," (2) "there are questions of law or fact common to the class," (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and (4) "the representative parties will fairly and adequately protect the interests of the class." Plaintiffs seek certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  At the class certification stage, the Court considers the merits of Plaintiffs' case "only to the extent [] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  In re Diamond Foods, Inc. Sec. Litig., 295 F.R.D. 240, 245 (N.D. Cal. 2013) (quoting Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013)).

## III.   DISCUSSION

Musk does not appear to contest that Plaintiffs satisfy the first two Rule 23(a) requirements—numerosity and commonality.  Rather, he focuses his arguments on the latter two requirements—typicality and adequacy—as well as Rule 23(b)(3)'s requirement that common questions of fact and law predominate.  He also challenges the class definition as overbroad, asserting that it includes class members who did not suffer harm.

### A.   Predominance of Common Questions

Musk's primary argument against class certification is that common questions do not predominate over individual questions and, as a result, a class action is not superior to

other available methods.  Musk contends that whether class members relied on his allegedly misleading statements is "inherently" an individual question, specifically arguing that "sophisticated" investors could have immediately realized the falsity of his statements such that they would not rely on those statements.  Opp. (dkt. 99) at 8–9.

Plaintiffs do not intend to prove individual reliance, however.  Instead, they assert that they are entitled to a presumption of reliance under the fraud-on-the-market doctrine, which the Supreme Court blessed in Basic Inc. v. Levinson, 485 U.S. 224, 244–47 (1988).  See Mot. (dkt. 76) at 11.  In Basic, the Court held that "if a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities."  Amgen, 568 U.S. at 462 (citing Basic, 485 U.S. at 245–47).  The Basic presumption is rebuttable, however: "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."  Basic, 485 U.S. at 248.  So, for example, if "the 'market makers' were privy to the truth," if the truth "credibly entered the market and dissipated the effects of the misstatements," or if individual plaintiffs would have traded how they did "without relying on the integrity of the market," the Basic presumption would be rebutted.  Id. at 248–49.[1]

Musk argues that Plaintiffs cannot rely on Basic's presumption for three reasons.  First, Musk asserts that Basic does not apply out of the gate because Plaintiffs' argument rests on the market for Twitter shares being inefficient.  Second, Musk argues that the Basic presumption would be rebutted by evidence that his alleged misrepresentations did not impact the value of Twitter shares.  Third, Musk argues that, even if the Basic presumption applies and is not rebutted at the class level, Rule 23(b)(3) is not satisfied because the individual question (whether individual investors relied on Musk's statements)

---

[1] The parties also dispute whether a different presumption of reliance applies under Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972).  Because the Court holds that Plaintiffs are entitled to a presumption of reliance under Basic, the Court need not reach whether a presumption would also exist under Affiliated Ute.

United States District Court
Northern District of California

1   predominates over any common questions.

2         **1.**      <u>Basic</u>'s requirement of an efficient market is satisfied.

3         Musk's argument regarding an efficient market is somewhat unusual in that he does

4   not appear to contest that Twitter is an efficient market in fact; instead, he argues that

5   Plaintiffs' "own theories of falsity and loss causation are fundamentally incompatible

6   with" an efficient market. Opp. at 9. That is because, as Musk puts it, Plaintiffs allege that

7   some segment of the market was misled by Musk's statements but that sophisticated

8   investors were not misled. <u>Id.</u> Indeed, Musk states that Plaintiffs "conceded" that

9   sophisticated investors were not misled. <u>Id.</u> at 10–11 (citing Pl.'s Opp. to Mot. for J. on

10  the Pleadings (dkt. 62) at 10–12). So, Musk's argument goes, if sophisticated investors

11  knew that Musk's statements were false but the market reacted to Musk's statements

12  anyway, then the market must be inefficient because it failed to take into account all the

13  relevant information. <u>Id.</u>

14        Musk's argument proves too much. To start, Plaintiffs never conceded that

15  sophisticated investors were not misled by Musk's tweets. <u>See</u> Pl.'s Opp. to Mot. for J. on

16  the Pleadings at 11 ("[T]he test is not whether experienced and skilled professionals in the

17  field would know that Musk's tweets were false"); <u>see also</u> <u>id.</u> (pointing out that "Musk's

18  own citations to analysts' opinions and finance articles show the uncertainty, speculation,

19  and inconsistent information in the market"). Moreover, even if Musk is correct that some

20  hypothetical sophisticated investor "knew" that Musk's statements were untrue (though

21  Musk does not identify any such investor) that does not change the calculus. An efficient

22  market presumes that all publicly available <u>information</u>—not investors' "comments" on, or

23  their "aggregation" or "summary" of, that information—is reflected in the stock price. <u>See</u>

24  <u>Bonanno v. Cellular Biomedicine Grp., Inc.</u>, 2016 WL 4585753, at *4–5 (N.D. Cal. Sept.

25  2, 2016). And as the Court has already held, the publicly available information in this case

26  (namely, the Merger Agreement) does not clearly showcase the falsity of Musk's

27  statements. MTD Order at 20 n.8, 23–25. In other words, Plaintiffs' theory of the case

28  accounts for the Merger Agreement in their efficient market hypothesis. Their theory is

1    simply that Musk's statements were misleading—even to sophisticated investors and even

2    in light of the Merger Agreement—and that his statements affected Twitter's stock price as

3    a result.  That Musk contests whether his statements were misleading when considered

4    alongside the Merger Agreement does not change Plaintiffs' facially viable theory.[2]

5         Because Plaintiffs adequately allege an efficient market, and Musk does not contest

6    the other prerequisites to establish the <u>Basic</u> presumption of reliance at the class

7    certification stage,[3] the <u>Basic</u> presumption of reliance applies.

8              **2.    There is insufficient evidence to rebut the <u>Basic</u> presumption.**

9         Musk next contends that the <u>Basic</u> presumption is rebutted by evidence that Musk's

10   alleged misrepresentations did not impact Twitter's stock price.  His argument on this front

11   takes two forms: (1) that the market was already aware of the truth behind his statements,

12   and (2) that his statements did not impact the market.  Opp. at 12.

13        Both points are premature.  As to the first, a "truth-on-the-market" defense like

14   Musk's "is a matter for trial," not for class certification.  <u>Amgen</u>, 568 U.S. at 481–82; <u>see</u>

15   <u>also</u> <u>In re Diamond Foods</u>, 295 F.R.D. at 250.  As to the second, the Supreme Court has

16   explained that disputes about loss causation "ha[ve] nothing to do with whether an investor

17   relied on the misrepresentation in the first place, either directly or presumptively through

18   the fraud-on-the-market theory [i.e., the <u>Basic</u> presumption]."  <u>Halliburton I</u>, 563 U.S. at

19   813.

20        To be sure, the Court cannot "ignore a defendant's direct, more salient evidence

21   showing that [an] alleged misrepresentation did not actually affect the stock's market

22   price."  <u>Halliburton Co. v. Erica P. John Fund, Inc.</u> (<u>Halliburton II</u>), 573 U.S. 258, 282

23   (2014).  Musk does not provide such evidence.  He concedes that Twitter's stock price

24

25   ───────────────
     [2] Musk also suggests that Plaintiffs' efficient market hypothesis fails because "<u>Plaintiffs'</u>
26   <u>own counsel</u> possessed sufficient information" to assert claims against Musk.  Opp. at 10
     (emphasis in original).  The Court rejects this view, which, if adopted, would have the
27   perverse effect of penalizing plaintiffs and their lawyers for enforcing the securities laws.
     [3] Namely, that his alleged misstatements were public and that the class members sold
28   shares after he made his statements but before he corrected them.  <u>Erica P. John Fund, Inc.</u>
     <u>v. Halliburton Co.</u> (<u>Halliburton I</u>), 563 U.S. 804, 811 (2011).

United States District Court
Northern District of California

1  dropped on May 13, the day of his first allegedly misleading statement, but he argues that

2  any decrease in value is due to the "uncertainty" created by his statement.  Opp. at 13.

3  That is a distinction without a difference: the Court is aware of no authority that would

4  suggest one degree of separation defeats the causal link between allegedly misleading

5  statements and their impact on the market.  Plus, there is more evidence that Musk's

6  statements affected the Twitter's stock price.  His own expert witness identified over a

7  dozen institutional investors who sold Twitter stock when shares were well under the

8  $54.20 merger price.  Saha Rpt. (dkt. 99-6) at 42.[4]  And as the Court has already explained,

9  the fact that Twitter's stock price rose after Musk's October 4, 2022 correction of his

10  allegedly misleading statements is evidence that the statements themselves had an impact

11  on Twitter's stock price.  MTD Order at 35–37.

12          Musk's rebuttal evidence is insufficient to rebut the <u>Basic</u> presumption at this stage,

13  so class-wide reliance is presumed.

### 3.    The <u>Basic</u> presumption satisfies Rule 23(b)(3).

15          Musk also argues that, even if Plaintiffs are entitled to the <u>Basic</u> presumption and

16  the presumption is not rebutted, individual inquiries into individual class members'

17  reliance on Musk's allegedly misleading statements predominate over common questions

18  of law and fact.  Opp. at 16.  This argument is not viable from the start.  Once a plaintiff

19  proves that the <u>Basic</u> presumption applies, the predominance requirement of Rule 23(b)(3)

20  is met.  <u>See</u> <u>Halliburton II</u>, 573 U.S. at 276; <u>see also</u> <u>Amgen</u>, 568 U.S. at 462–63 ("Absent

21  the fraud-on-the-market theory, the requirement that Rule 10b-5 plaintiffs establish

22  reliance would ordinarily preclude certification of a class action seeking money damages

23  because individual reliance issues would overwhelm questions common to the class.");

24  <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 509 (9th Cir. 1992) ("the defense of non-

25  reliance is not a basis for denial of class certification").  The Court's determination that the

26  <u>Basic</u> presumption of reliance applies therefore means that Plaintiffs satisfy Rule 23(b)(3).

27

28  [4] Certification of the class moots Plaintiffs' pending motion to strike Dr. Saha's report.
    This does not preclude Plaintiffs from raising future <u>Daubert</u> challenges as to Dr. Saha.

United States District Court
Northern District of California

### B.      Typicality of Lead Plaintiffs' Claims

Musk's first argument under Rule 23(a) is that Lead Plaintiffs' claims are atypical because Lead Plaintiffs did not rely on Musk's alleged misstatements when trading Twitter stock. This, Musk contends, opens Lead Plaintiffs up to unique defenses and makes them improper class representatives. Opp. at 19–20.

This challenge to the typicality of Lead Plaintiffs' claims is in large part the same as the challenge to the <u>Basic</u> presumption, just targeted specifically at Lead Plaintiffs. To that extent—i.e., to the extent that Musk argues that Lead Plaintiffs were sophisticated enough to not be misled by Musk's statements—his argument fails. "Sophisticated investors are as entitled to rely on the fraud-on-the-market theory as anyone else." <u>Hanon</u>, 976 F.2d at 506.

In any case, Musk's assertion that Lead Plaintiffs were aware at the time that his statements were false is not supported by their deposition testimony. Aside from a few stray quotes suggesting that some Lead Plaintiffs "believed the deal would close" even after Musk's allegedly misleading statements, <u>e.g.</u>, Belgrave Dep. Tr. (dkt. 99-4) at 181:7, three of the four Lead Plaintiffs indicated that Musk's statements and their impact on the market caused them to sell Twitter stock. <u>See, e.g.</u>, <u>id.</u> at 179:24–25 ("Like I say, it's everything that [Musk] said which led me to sell."); Price Dep. Tr. (dkt. 102-6) at 24:6–12 (describing John Garrett's decision to sell Twitter shares when he became "worried that this [the deal] wouldn't come to fruition").

The evidence does, however, preclude Steve Garrett from establishing reliance on any of Musk's allegedly misleading statements. Steve testified that he sold his shares in July 2022 because Musk said that he was terminating the deal, and he ruled out any other reason for doing so. S. Garrett Dep. Tr. (dkt. 99-5) at 30:25–31:6 ("Q: Are there any other statements that Mr. Musk made that caused you to enter or exit positions, to buy or sell Twitter stock or options? A: Nothing that sticks out. It was a pretty firm statement that he made that he is terminating the deal. The word 'terminated' is a pretty strongly worded statement."). Steve's specific identification of something other than the integrity of the

9

market (and, of course, other than Musk's allegedly misleading statements) that caused him to sell Twitter stock "severs" any causal chain linking his decision to Musk's statements and rebuts the presumption that he relied on Musk's statements. See Basic, 485 U.S. at 248. He therefore is not an appropriate class representative.

### C.      Adequacy of Lead Plaintiffs

Musk further contends that Lead Plaintiffs are inadequate class representatives "because they are so unfamiliar with the basic facts, theory, and elements of their claims that 'there is no sense that there is an actual party behind the prosecution of the action.'" Opp. at 20 (cleaned up) (citation omitted). In particular, Musk argues that Price is "ignorant of the contents of [] Musk's statements" and that Belgrave and John Garrett are "ignorant of … why the statements at issue were purportedly misleading." Id.

Musk is correct that Price expressed limited familiarity with his allegedly misleading statements. That said, it is too much to say that she lacks any familiarity with those statements. She knew, for example, that Musk complained about not receiving "information" related to "the percentage of [] something" and that "bots" were involved (though she did not know what Twitter bots are). Price Dep. Tr. (dkt. 99-3) at 70:6–7, 70:25–71:4, 71:8–11. That is not a problem: courts can approve class representatives even when the prospective representatives do "not know the specific misrepresentations alleged in the complaint." In re Storage Tech. Corp. Sec. Litig., 113 F.R.D. 113, 119 (D. Colo. 1986). The more important inquiry is whether the prospective class representative "understands the underlying legal basis of [their] action" and their "duty to represent class members." Id. Price clearly meets these criteria. See Price Dep. Tr. (dkt. 102-6) at 30:6–7 (describing the class), 55:19–23 (describing the underlying legal basis of the action). She is therefore an adequate class representative.

As for Belgrave and John Garrett's testimony, Musk mischaracterizes it. Both show at least some basic understanding of why Musk's statements were allegedly misleading: Belgrave explained that Musk's statement that "the deal cannot move forward" was misleading because Musk waived due diligence and so did not have the right to stop the

10

deal.  Belgrave Dep. Tr. (dkt. 102-4) at 177:15–24.  And John Garrett testified that Musk's statements suggesting that the deal "was on and off" and that "he wasn't going to buy the company" were misleading because Musk "was going to keep his commitment to pay all existing shareholders [$]54.20."  J. Garrett Dep. Tr. (dkt. 99-2) at 106:5–6; J. Garrett Dep. Tr. (dkt. 102-5) at 103:2–10.  Belgrave and Garrett's testimony describes, if in simplified terms, Plaintiffs' legal theory as to what makes Musk's statements misleading.  That is enough.  See Koenig v. Benson, 117 F.R.D. 330, 337 (E.D.N.Y. 1987) ("named plaintiffs require only a basic knowledge of the facts"); see also, e.g., In re Storage Tech., 113 F.R.D. at 119 (approving class representatives when they understood "the underlying legal basis of [the] action" and were "familiar with … the subject of the alleged misrepresentations").  Belgrave and John Garrett are thus adequate class representatives.[5]

### D.    Class Definition

Musk's final challenge is to the definition of the class as overbroad.  Musk argues that the class definition includes some investors who made money—and perhaps even made a net profit—as a result of Twitter's lower stock price during the Class Period.  Opp. at 18–19.  Relatedly, Musk argues that Plaintiffs' damages model runs afoul of Comcast Corp. v. Behrend, 569 U.S. 27 (2013), because it does not net out potential earnings by class members who bought Twitter stock during the Class Period.

As to the class definition, "fortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class," and it is appropriate to wait until the damages phase of the litigation to "winnow out those non-injured members" at that time. Ruiz Torres v. Mercer Canyons, Inc., 835 F.3d 1125, 1137 (9th Cir. 2016).  Musk does not offer any evidence to suggest that there is such "a great number of members" who were not harmed that "the class definition is fatally overbroad."  See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (en banc). Nor does he explain in any detail why individualized questions about damages would

---

[5] Musk does not challenge the adequacy of class counsel.  See Amchem, 521 U.S. at 626 n.20 ("The adequacy heading also factors in competency and conflicts of class counsel.").

1   "render [the] adjudication unmanageable." Id. at 669 n.13 (citation omitted).[6]

2         Musk's challenge to Plaintiffs' damages model also fails.  Musk argues that

3   Comcast requires Plaintiffs' damages model to be capable of class-wide measurement.

4   Opp. at 19.  But "[t]he Ninth Circuit reads Comcast to demand only that plaintiffs 'be able

5   to show that their damages stemmed from the defendant's actions that created the legal

6   liability.'" Hatamian v. Advanced Micro Devices, Inc., 2016 WL 1042502, at *8 (N.D.

7   Cal. Mar. 16, 2016) (quoting Leyva v. Medline Indus., Inc., 716 F.3d 510, 514 (9th Cir.

8   2013)).  Other circuits reach the same outcome.  See id. (collecting cases).  The damages

9   model is appropriate so long as "damages could feasibly and efficiently be calculated once

10  the common liability questions are adjudicated." Leyva, 716 F.3d at 514.  Musk offers no

11  argument to the contrary.

**IV.   CONCLUSION**

13        For the foregoing reasons, the Court **CERTIFIES** the following class in this action:

> All persons and entities who sold the publicly traded stock or
> call options, or purchased the put options, of Twitter, Inc.
> during the period from May 13, 2022 through October 4, 2022,
> both dates inclusive, and who suffered damages by
> Defendant's alleged violations of § 10(b) and of the Exchange
> Act.

18  The Court **APPOINTS** Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as

19  class counsel and Nancy Price, John Garrett, and Brian Belgrave as class representatives.

20     **IT IS SO ORDERED.**

21       Dated: September 27, 2024



CHARLES R. BREYER
United States District Judge

---

[6] Musk is correct that, in some circumstances, an investor who made money by buying and
selling Twitter stock during the class period might not have been injured at all if they made
a net profit.  That said, the calculations necessary to determine if an investor was injured
are identical to those necessary to determine how much an investor was damaged.  In other
words, the class will "rely on the same body of common evidence to establish the common
issue," see Olean Wholesale Grocery, 31 F.4th at 670 n.14, even if some investors are
ultimately excluded from the class on the basis that they suffered no injury.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* <u>http://www.ca9.uscourts.gov/forms/form15instructions.pdf</u>

**9th Cir. Case Number(s)** _____

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[XX ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

See attached service list.

**Description of Document(s)** *(required for all documents)***:**

Petition for permission to file appeal pursuant to Fed. R. Civ. P. 23(f)

**Signature** _/s/ David Cooper_____ **Date** __10/11/2024_____

*Feedback or questions about this form? Email us at* <u>forms@ca9.uscourts.gov</u>

**Form 15**          *Rev. 12/01/18*

**SERVICE LIST**

| | |
|---|---|
| COTCHETT, PITRE & MCCARTHY, LLP<br>Joseph W. Cotchett (SBN 36324)<br>jcotchett@cpmlegal.com<br>Mark C. Molumphy (SBN 168009)<br>mmolumphy@cpmlegal.com<br>Tyson C. Redenbarger (SBN 294424)<br>tredenbarger@cpmlegal.com<br>Gia Jung (SBN 340160)<br>gjung@cpmlegal.com<br>San Francisco Airport Office Center 840<br>Malcolm Road, Suite 200 Burlingame,<br>California 94010 Telephone: (650) 697-6000<br><br>*Lead Counsel for Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, Brian Belgrave and the Proposed Class* | BOTTINI & BOTTINI, INC.<br>Francis A. Bottini, Jr. (SBN 175783)<br>fbottini@bottinilaw.com<br>Albert Y. Chang (SBN 296065)<br>achang@bottinilaw.com<br>Aaron P. Arnzen (SBN 218272)<br>aarnzen@bottinilaw.com<br>7817 Ivanhoe Avenue, Suite 102 La Jolla,<br>California 92037 Telephone: (858) 914-2001<br>Facsimile: (858) 914-2002<br><br>*Lead Counsel for Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, Brian Belgrave and the Proposed Class* |
| Richard Martin Heimann<br>Lieff Cabraser Heimann & Bernstein<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3339<br>415-956-1000<br>Email: rheimann@lchb.com<br><br>*Counsel for Movant Mohammed Samara* | |